Argued and submitted August 18, reversed and remanded December 29, 2016

In the Matter of M. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. S.,
*Appellant.*

Josephine County Circuit Court
120145J;
Petition Number 120145J01;
A160985 (Control)

In the Matter of M. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. S.,
*Appellant.*

Josephine County Circuit Court
120145J;
Petition Number 120145J01;
A160992

In the Matter of M. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

Z. B. W.,
*Appellant.*

Josephine County Circuit Court
120145J;
Petition Number 120145J01;
A160993

388 P3d 1178

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Sarah Peterson, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant S. S.

Ginger Fitch filed the brief for appellant Z. B. W.

Megan L. Jacquot filed the brief for appellant M. S.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Cecil A. Reniche-Smith, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Egan, Judge, and Lagesen, Judge.

## ORTEGA, P. J.

Mother, father, and their child, M, appeal a permanency judgment that changed the permanency plan for M from guardianship to adoption and ordered the Department of Human Services (DHS) to file a petition to terminate the parental rights of mother and father (TPR petition). Mother argues in several assignments of error that the juvenile court erroneously concluded that it was required to change the plan to adoption because of the passage of time and that it failed to conduct the legal analysis required by ORS 419B.476(5) and ORS 419B.498(2) to determine the most appropriate permanency plan for M. Further, mother contends that the court was not authorized to change the permanency plan to adoption because the "undisputed facts *** failed to demonstrate that the department could prevail on its [TPR petition] such that adoption would be achievable." Father joins mother's assignments of error on appeal, and makes the additional assignment that the juvenile court erred in rejecting his argument that issue preclusion prevented the court from changing the plan to adoption because the court had refused to make that change in a previous permanency judgment. M also joins mother's assignments of error and arguments, urging us to reverse the juvenile court's permanency judgment. We reverse and remand based on our conclusion that the juvenile court failed to conduct the statutorily required "child-centered" determination when it decided that there was no compelling reason to change the plan to something other than adoption.

We state the facts consistently with the juvenile court's express and implied findings, supplemented by uncontroverted information in the record. *Dept. of Human Services v. T. C. A.*, 251 Or App 407, 410, 283 P3d 956, *rev den*, 352 Or 665 (2012). When M was born in October 2012, mother was addicted to heroin. Consequently, M was born drug-affected and, when she was eight days old, DHS placed her in foster care with White, who is not a relative. The juvenile court took jurisdiction over M in December 2012, based on the use of controlled substances by both parents, and on father's criminal activity. Over the next several months, both parents continued to struggle with drug addiction,

failed to successfully complete treatment, and inconsistently attended scheduled visits with M. They were both arrested in April 2013 and eventually were convicted of felonies and were incarcerated. DHS filed an amended petition, adding allegations regarding parents' inability to serve as parenting resources for M due to their incarceration. Mother was scheduled to be released from prison in August 2016, and father's scheduled release date is in September 2020.

M's maternal grandmother began weekly DHS-supervised in-person visits with M in March 2013. Grandmother consistently attended those visits and, according to the DHS caseworker who supervised those visits, they went very well and resulted in a bond growing between M and grandmother.

During her incarceration at Coffee Creek Correctional Facility (CCCF), mother consistently participated in video-conferences and telephone communication with M, and sent M letters, drawings, and dictated audio books. The record also demonstrates that mother engaged in the programs that were available to her as an inmate, including AA and NA, a parenting program, a behavioral health course on healthy coping skills, and an expressive writing course. Mother also obtained her GED and secured jobs outside the prison as a carpenter's assistant and wildland firefighter. At the time of the permanency hearing, she had plans to engage in drug and alcohol treatment during her final six months of incarceration and intended to train as a carpenter's apprentice upon her release. White felt that it is very important for M to have a relationship with grandmother and mother and she fostered those relationships while M was in her care. Further, she indicated that she was willing to be a permanent resource for M whether that was accomplished through a guardianship or through adoption.

In late 2013, DHS asked the court to change the permanency plan from reunification to adoption. At that time, mother acknowledged that a change in plan away from reunification was necessary, but asked the court to change the plan to guardianship—preferably with grandmother as M's guardian. After a permanency hearing in February 2014, the court changed the plan from reunification to

guardianship, explaining in a letter opinion that it was not appropriate at that time to change the plan to adoption because there was evidence that M had bonded with grandmother and White and that mother had been "self-motivated to avail herself [of] limited services during her incarceration, including biweekly computer visits with [M]." In the court's view, a "permanent guardianship would provide the necessary permanency for [M] as well as the greatest possibility to continue the important relationships outlined in this letter [opinion]."

In September 2014, DHS removed M from nonrelative foster care with White and placed her with relatives in Kansas.[1] M's Kansas relatives limited M's communication with grandmother, mother, and White. In February 2015, at a review hearing, the court "extended" that "plan" for six months. In April 2015, M's Kansas relatives informed DHS that they no longer wanted to be considered a permanent resource for M and asked DHS to return her to Oregon. Accordingly, after a seven-month absence, DHS placed M back in White's home. Upon returning to White's care, M was "more clingy" and had difficulty with "short transitions."

Once M returned to White's home, grandmother resumed weekly in-person visits at White's home, with DHS approval but without DHS supervision. Those visits sometimes lasted all day, and White described the bond between M and grandmother as "very strong." In July 2015, White took M to CCCF for a face-to-face visit with mother. M considers mother her "friend" and a bond exists between them.

In August 2015, DHS again sought to change the permanency plan to adoption. DHS argued that M had been in temporary substitute care for nearly three years and that a permanent guardianship was not in M's best interests and was "not the most permanent plan for [M]." DHS pointed to the requirement in ORS 419B.498 that, where a child has been in substitute care for "15 months of the most recent 22 months," DHS is required to proceed to termination of parental rights unless "[t]here is a compelling reason, which is documented in the case plan, for determining that filing

---

[1] DHS had considered and rejected grandmother as a permanent resource for M. Under DHS policy, the agency then sought another placement with a relative.

such a petition would not be in the best interests of the child." DHS asserted that, given M's age and lack of special needs, she was adoptable. DHS also argued that adoption was the only permanency plan that allows a child the opportunity to grow up with, and have a primary attachment to, a caregiver.

Mother opposed a change in plan, arguing that, as the court had determined a year before in its prior permanency judgment, a guardianship would provide M with necessary permanency while allowing her to maintain her relationships with grandmother, White, and mother.

At the permanency hearing, a DHS caseworker testified that M was very bonded with White and that a transition would be difficult for her, although not "impossible." The caseworker explained that DHS would consider White as a permanent resource, whether through adoption or guardianship, but acknowledged that the department may also look at other resources. The caseworker also expressed the view that adoption is generally preferred over guardianship because of the "primary attachment needs of the child" and because guardianships can be vacated under certain circumstances. That is, guardianship is not as "permanent" as adoption. The caseworker also acknowledged that M has bonded with grandmother.

After the permanency hearing, the juvenile court entered a permanency judgment that changed the plan from guardianship to adoption, concluding that there was no "compelling reason" under ORS 419B.498(2)(b) to preclude DHS from filing a petition to terminate parents' rights.

Before we explain the court's reasoning for changing the plan, we set out the legal framework that guides that decision. As a general matter, the juvenile dependency code requires permanency hearings to be held at regularly scheduled intervals and upon the request of a party to the proceeding. ORS 419B.470. After a permanency hearing, ORS 419B.476(5) requires the juvenile court to enter an order within 20 days. That order must include specific findings. *Id.* As relevant here, when the court determines that the permanency plan for the child should be adoption, among other things, the court's order must include

a "determination of whether one of the circumstances in ORS 419B.498(2) is applicable." ORS 419B.476(5)(d). In relevant part, ORS 419B.498(2)(b) requires DHS to file a petition to terminate parental rights if the child has been in substitute care under the responsibility of DHS "for 15 months of the most recent 22 months" *unless* "[t]here is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child." The statute further provides, in relevant part, that "compelling reasons" may include, but are not limited to, circumstances where "[a]nother permanent plan is better suited to meet the health and safety needs of the child * * *, including the need to preserve the child's * * * sibling attachments and relationships." ORS 419B.498(2)(b)(B). We have described the determinations required after a permanency hearing as reflecting the legislature's intent that

> "the [juvenile] court carefully evaluate DHS's decision to change a permanency plan for a child to ensure that the decision is one that is most likely to lead to a positive outcome for the child."

*State ex rel DHS v. M. A. (A139693)*, 227 Or App 172, 183, 205 P3d 36 (2009). In other words, ORS 419B.476(5) and ORS 419B.498(2) call for a "child-centered" determination based on a current evaluation of the child's circumstances. *Dept. of Human Services v. T. M. S.*, 273 Or App 286, 295, 359 P3d 425 (2015).

As noted, the court indicated in the permanency judgment changing the plan to adoption that there was not a "compelling reason * * * for determining that filing a petition to terminate parents' parental rights would not be in the child's best interests." The court explained that determination in a letter opinion in which it found that White had established a bond with M and that, as long as White was M's caregiver, she intended to preserve mother's relationship with M. The court also found that mother had rehabilitated herself in prison and "would be a worthy parent to which to return her child, including during the process of a TPR and completion of an adoption plan. It may be a travesty should mother's parental rights be terminated if she is a worthy parent." However, the court noted, "on the other

hand," mother's improved "circumstances" at the time of the permanency hearing held no guarantee that she would be a "worthy parent" at the time of her release, and "ORS chapter 419B is not based upon waiting to see if reasonable suspicions and predictions work out for the best of everyone, including the child." The court further noted that, since the last permanency hearing in February 2014, "a substantial amount of * * * time has passed with no permanency beyond * * * White as foster parent."

Moving on to the determinations required by ORS 419B.476(5) and ORS 419B.498(2), the court noted that ORS 419B.498 makes adoption the "priority" when reunification is not an option. In particular, the court noted that *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 796 P2d 1193 (1990), "appears to" indicate that if reunification is not possible, "it is in the child's best interests that the legal relationship between the child and parents be severed to allow the child to be adopted by a family that can provide the child with a permanency the parents cannot provide." Although the court noted that the facts in *Geist* differed significantly from the facts of this case, the court concluded that, nevertheless, "the concept is the same."

The juvenile court then explained its ultimate decision to change the plan to adoption:

"[*Geist*] virtually sets out that presumptively the best interests of the child by statute are to proceed to adoption. It logically follows then that where the 'compelling' fact supporting the selection of guardianship is based upon this desire to allow the parents to remain parents and that relationship not be terminated, that the court cannot order a change of plan to guardianship and must order the TPR be filed. I also conclude logic requires in this situation that the court finds the best interest of the child requires the court to change the plan to adoption.

"This may seem to be a harsh rule, however this matter was decided at the legislative level. This court does not have discretion to alter the statutory guidelines. The apparent legislative intent is to provide permanency and in the order and within the factors predetermined. Without more this court could not conclude differently. Parents may reply with the argument that under these concepts

a guardianship would never be chosen as a plan. That depends upon whether there are compelling reasons for the court to overrule the statutory priority. *This would likely be quite limited when the issue is created by the parents and not an issue with the child. Here the parents created the circumstances that resulted in DHS taking jurisdiction in the first place. Because one of the parents will be released from prison in the not so distant future is not a 'child' issue, it is a parent issue.*

"I conclude that the appropriate plan is adoption and that the state is required by law to file a TPR. If the situation changes [*sic*] so parent or a parent, then so be it, and the plan can be changed to return to parent."

(Emphasis added.)

Before we address mother's assignments of error, we pause to briefly discuss the threshold issue raised by father—namely, that issue preclusion prevented the court from changing the plan to adoption in August 2015 because the court had refused to do so at the earlier permanency hearing held in February 2014. Issue preclusion operates to prevent relitigation of an issue in another proceeding if five requirements are met: (1) the issue in the two proceedings is identical; (2) the issue was actually litigated in the first proceeding and was essential to a final decision on the merits; (3) the party sought to be precluded had a full and fair opportunity to be heard on the issue; (4) the party sought to be precluded was a party or was in privity with a party to the prior proceeding; and (5) the prior proceeding was the type of proceeding to which a court will give preclusive effect. *Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 104, 862 P2d 1293 (1993).

We conclude that the court's 2014 decision not to change the permanency plan to adoption does not preclude the court's change in plan after the August 2015 permanency hearing. The juvenile dependency code *requires* periodic permanency hearings, ORS 419B.470, and at those hearings, the court is charged with evaluating the appropriate permanency plan for the child. ORS 419B.476(5). A meaningful evaluation necessarily means that the prior evaluation is not automatically preclusive. We have noted that issue

preclusion is subject to certain exceptions, including that "a final determination is not conclusive when, by provision of a statute or valid rule of the body making the final determination, that determination does not bar another action or proceeding on the same transactional claim." *Kiltow v. SAIF*, 271 Or App 471, 475-76, 351 P3d 786 (2015). That principle applies in the circumstances of this case, where the court held the permanency hearing in August 2015 (18 months after the February 2014 hearing) pursuant to a statutory requirement, and it appropriately revisited the issue of the appropriate permanency plan for M at that hearing. *See Dept. of Human Services v. T. L.*, 358 Or 679, 689, 369 P3d 1159 (2016) (describing the role and nature of permanency proceedings in dependency cases, including the court's need to "determine and update, as appropriate, a permanent plan for children in care in accordance with specific time requirements and other conditions").

Proceeding to mother's assignments of error addressing the court's change in plan, she argues that the juvenile court did not engage in the required statutory analysis, but instead determined that, because adoption is the "legislatively preferred plan," and because M had been in foster care for 15 of the previous 22 months, the court had no choice but to change the plan to adoption. Mother explains that, in doing so, the juvenile court failed to engage in the "child-centered" determination that was required by the legislature through ORS 419B.476(5) and ORS 419B.498(2). That is, mother claims that, "[n]otwithstanding the length of time that [M] had been in foster care and the theoretical benefits of adoption to children generally," the juvenile court abdicated its legal responsibility to "engage in a detailed factual and legal analysis and conclude what permanency plan was the most appropriate one for [M] given her need to maintain her existing bonds and relationships." In mother's view, the record established that the permanency plan of guardianship was best suited to meet M's needs, and that the court's analysis failed to address the state of the record on that issue. Mother also claims that the record establishes that adoption was unlikely to be achieved because the "undisputed facts" at the permanency hearing failed to demonstrate that DHS could prevail in terminating her

parental rights—presumably because of the progress mother had made *during* her incarceration.[2]

DHS counters that the juvenile court engaged in the appropriate analysis and, after doing so, appropriately concluded that the change in plan to adoption was in M's best interests. In DHS's view, the court noted that DHS is generally required to pursue termination under the "22 month rule" unless an exception in ORS 419B.498(2) applies. According to DHS, the court, after discussing the arguments of parents and M that guardianship was the best plan, concluded that preserving a child's bond to a foster parent or parent was not a compelling reason to change M's permanency plan to something other than adoption. Thus, DHS contends that the court's letter opinion reflects the appropriate legal analysis under the relevant statutes, and that, in conducting that analysis, the court properly concluded that no compelling reason existed to preclude changing the plan and ordering DHS to file a termination petition.

We begin our analysis with the standard of review. Generally, in non-*de novo* review cases, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the [juvenile] court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). However, whether the juvenile court applied the correct legal standard in making its "compelling reason" determination presents a question of law that we review for legal error. *See Finney-Chokey and Chokey*, 280 Or App 347, 360, 381 P3d 1015 (2016) (whether the trial court applied the correct legal standard in making a "best interests" determination presents a question of law reviewed for legal error).

We agree with mother that the court's analysis does not reflect the "child-centered" determination that is required by ORS 419B.476(5) and ORS 419B.498(2)(b). That

---

[2] Given our ultimate disposition reversing and remanding the permanency judgment, we decline to address mother's assertion that the court could not change the plan to adoption because "the undisputed facts at the permanency hearing failed to demonstrate that the department could prevail on its [TPR petition] such that adoption would be achievable."

is, the court appears to have applied a rule that, because parents created the need for the juvenile court to assume jurisdiction, the desire to preserve a relationship between parents and child cannot qualify as a "compelling reason" not to change the plan to adoption. Put another way, the court appears to have concluded that when the parents "caused" the circumstances underlying jurisdiction (which presumably would be many cases), a plan of guardianship could be chosen over adoption only in limited circumstances, and *not* in circumstances where the evidence demonstrates that preserving a parental relationship is in the child's best interests. In that way, the court failed to focus on M's best interests given her specific needs and circumstances. Specifically, the juvenile court did not evaluate, in light of M's specific circumstances (including her bonds with mother, grandmother, and White), whether the plan of guardianship would better meet her health and safety needs than would the plan of adoption. Instead, the court's singular focus on the legislature's "preference" for adoption and the "fault" of parents appears to have driven the court's "compelling reason" determination, without due consideration for M's particular circumstances. Accordingly, we must reverse and remand for the court to make that assessment in full recognition of M's particular circumstances, including her bonds with mother, grandmother, and White.[3]

We note that, depending on the specific circumstances of each case, retaining the relationship between a parent and child may or may not be a compelling reason

---

[3] We do not understand *Geist* to add much to the analysis that was required of the juvenile court in this case by ORS 419B.476(5) and ORS 419B.498(2). *Geist* was an appeal of a judgment terminating parental rights, and the precise issue in that case was whether a parent could raise a claim of inadequate assistance of counsel in such an appeal, and, if so, how that claim should be reviewed. Notwithstanding the Supreme Court's statement in *Geist* that a child's best interests will generally be served by terminating the parental rights of a parent who is "unable or unwilling to rehabilitate himself or herself within a reasonable time," 310 Or at 189, that point does not obviate the need to conduct the analysis required by ORS 419B.476(5) and ORS 419B.498(2)—*i.e.*, the "child-centered" determination involving a particular child's circumstances and needs at the time of the permanency hearing. In fact, *Geist* was decided before the legislature enacted the statutes that govern permanency proceedings, which, as the Supreme Court recently noted in *T. L.*, 358 Or at 689, established the permanency process of the Adoption and Safe Families Act of 1997. *See* 42 USC §§ 671-675.

to avoid changing a plan from guardianship to adoption. That is to say, there is no rule of law establishing that, in all cases, the value of retaining such a relationship is or is not a compelling reason under the statutes. As noted, ORS 419B.476(5) and ORS 419B.498(2) call for a "child-centered" determination based on a current evaluation of the child's circumstances. *T. M. S.*, 273 Or App at 295. Moreover, ORS 419B.498(2)(b)(B) explicitly recognizes that a compelling reason may exist where "[a]nother permanent plan is better suited to meet the health and safety *needs of the child.*" (Emphasis added.) Accordingly, the juvenile court must consider the best interests of the child given the particular circumstances of that child. Dependent on those circumstances, a plan that would allow the child to retain a relationship with a parent, grandparent, and a long-time foster parent may constitute a compelling reason to preclude DHS from filing a TPR petition. The court must "carefully evaluate DHS's decision to change a permanency plan for a child to ensure that the decision is one that is most likely to lead to a positive outcome for *the child.*" *M. A.*, 227 Or App at 183 (emphasis added).

Reversed and remanded.